[No. B238535. Second Dist., Div. Three. Sept. 12, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES AUSTIN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[/]].

[redacted]

## COUNSEL

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Colleen M. Tiedemann and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—In this case of first impression in California, we hold the trial court did not err by ruling a prosecution expert was qualified to testify a sexual assault victim could have experienced an orgasm during nonconsensual oral copulation.

C.L., the 14-year-old victim in this case, was defendant and appellant James Austin's stepdaughter. While Austin's wife was out of the country, Austin asked C.L. to sleep in his bed because he was lonely. Mutual massage eventually turned sexual as Austin began touching C.L.'s breasts, buttocks and vagina. He showed her pornographic videos. On four different occasions, he orally copulated her. C.L. testified she did not want Austin to be doing these things to her, but that she was afraid he would get angry if she refused. Austin had a bad temper, he kept guns in the house, and he warned C.L. if she revealed what he was doing she would be sent back to China, where she had been born. C.L. also testified that although she experienced orgasms when Austin orally copulated her, she did not enjoy it.

Austin was charged with a series of forcible and nonforcible sexual offenses, including oral copulation with a person under 16, forcible oral copulation, lewd act on a child, and attempted unlawful sexual intercourse (Pen. Code, §§ 288a, subds. (b) & (c)(2), 288, subd. (c)(2), 664, 261.5).[1] During opening statement, defense counsel told the jury Austin was guilty of all the nonforcible charges, but he was innocent of the forcible oral copulation charges. The prosecution theory was duress; the defense theory was reasonable belief in C.L.'s consent to the oral copulation.

Although the trial court initially ruled, reasonably in our view, that C.L.'s orgasms were not probative on the issue of her consent, the court later allowed this evidence on the ground the prosecution had opened the door. After C.L. testified she experienced an orgasm each of the four times Austin had orally copulated her, a prosecution expert testified an orgasm was merely a physiological reaction to physical stimulation. Asked if this meant a child could experience an orgasm while being sexually abused, the expert answered yes.

On appeal, Austin contends the expert was not qualified to give this testimony. We disagree. The expert, a licensed marriage and family therapist, was the clinical supervisor of a university-affiliated sexual assault treatment center and a specialist in the treatment of adolescent female sexual assault victims. As part of her education, the expert had received training in the biology and physiology of human sexual response. We hold the trial court did not err by ruling the expert was qualified to offer this testimony.

The judgment is affirmed.

---

[1] All further references are to the Penal Code unless otherwise specified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

 1. *Prosecution evidence.*

C.L. was born in China in 1994, and defendant Austin is her stepfather. After Austin married C.L.'s mother, they brought C.L. to the United States in 2005 when she was 11 years old. Before that, Austin lived with C.L. and her mother in China for about a year while they waited for C.L.'s visa application to be approved.

Starting in China, Austin's relationship with C.L. was that of father-daughter. He taught her English and, when she came to the United States, he helped her with her homework and cooked for her and her mother. C.L. loved Austin as a father.

When they first moved to the United States, C.L. had her own bedroom. But her parents later rented out some of the rooms in their house, so C.L. moved into their bedroom. She had her own bed on one side of the room, located behind a partition.

At the beginning of 2009,[2] C.L.'s mother went on a trip to China. While she was away, Austin asked C.L. to sleep in his bed with him because he felt lonely. C.L. testified she complied "[b]ecause he would get really angry when I don't, and then he will start saying like 'Oh, my goodness, like I feel so lonely. Your mom's not here.'" In the mornings, they gave each other massages. C.L. was afraid to refuse the massages because Austin "gets really angry and he gets really loud and the neighbors complain, and he carries a knife around. [¶] Also he has guns in the house, two huge ones under the bed, and he knows how to fire them . . . ." C.L. testified, "[W]e have [a] house that's in Lancaster that we also rent out, and one time he was going to Lancaster carrying his gun. [¶] So I was like 'Why are you carrying your gun?' [¶] And he's like 'Just in case that guy gets all crazy and I will just shoot him for self-defense.'"

---

[2] All further date references are to the year 2009 unless otherwise specified.

Initially these were nothing more than routine massages. "The first few times it was just massage, but the time that really made me feel uncomfortable was the time that he asked me to take my shirt off so he can massage my whole back. [¶] So I thought to myself this is kind of weird, but . . . at the time I didn't really think . . . anything was wrong. Like in China, they give you massage. When you go [to] a massage place, you don't have your shirt on." Eventually, Austin started touching C.L.'s breasts, her buttocks and her vagina. He kissed her using his tongue. He showed her pornographic videos a few times. On four different occasions he orally copulated her. These acts occurred during two different trips C.L.'s mother made to China that year, one in January and one in April. C.L. testified she did not want Austin to be doing these things to her. She also testified she experienced orgasms when Austin orally copulated her, but she did not enjoy it.

C.L. did not tell her mother or anyone else about what Austin was doing. Asked why, C.L. testified: "Well, he was telling me—well, he wasn't like threatening me—I know that he is, but at the time I didn't think it was, because he put it in a different way."

On May 2, 2009, the last time Austin orally copulated her, he had come to bed naked the night before. When C.L. awoke the next morning, Austin was "touching" and "cuddling with" her. He touched her breasts and her vagina, and "he licked [her] vagina." After doing that, Austin stood up. Over her parents' bed there was a mirror on the ceiling. In the mirror, C.L. saw that Austin had his penis in his hand. He was "coming closer . . . and he was trying to put his penis in [her] vagina." C.L. told him to stop and Austin replied, " 'Oh, okay. I just wanted to feel you.' "

C.L. testified:

"A. I got up and I told him that I don't want to do this anymore, and I don't feel comfortable and I don't think it's right. [¶] And then he said 'Yeah, I'll stop and we'll just go back to a father/daughter relationship.'

"Q. Was that hard for you to do?

"A. Yes, it was very hard. I couldn't get my courage together to tell him.

"Q. Before that?

"A. Yeah. I knew it was wrong, but I was just so scared, and I . . . wasn't very confident, and I didn't know what was going to happen because I didn't have any family in America, and it's not possible if I go back to China. [¶] And . . . I didn't know the law, and like I didn't know that he could get into so much trouble, like what if he's not in jail . . . ."

Asked why she waited so long to tell anyone what had been going on, C.L. testified Austin told her: "[D]o not ever tell your mom, because if you have to tell your mom she is going to kill me and you're going to end up in China. Do you want to go back to China?" Austin also said, "[Your mom] can't survive here. Like her English is not good enough, like she could never survive in America by herself. It's not possible. She can't even get gas."

The following colloquy occurred:

"Q. And were there any particular times where you were afraid of the defendant?

"A. When he—yes. He gets really, really angry and he gets really loud.

"Q. And is this something that happened only when you turned 14, or is this the way he's kind of been since you've known him?

"A. Well, he's gotten worse when I turned 14, but before that he was still very, very loud, and when him and my mom would get into an argument it's really, really loud and he will like scream and yell and his face gets all red."

On cross-examination, the following colloquy occurred:

"Q. He never physically forced you—he never restrained you physically or opened your legs physically, did he?

"A. Yes, he did.

"Q. He never . . . physically pried your legs open, did he?

"A. Yes, he did.

"Q. You never testified to that, did you?

"A. They never asked me."

The colloquy further continued:

"Q. You testified that you didn't know the law and you thought you had to comply?

"A. Yes.

"Q. And you never told him to stop until the last time, correct?

"A. Yes.

"Q. That's the only time you told him to stop; is that true?

"Q. Yes."

On May 9, C.L. told her martial arts instructor, Chad Moore, that Austin had been orally copulating her. She said it had happened four times over a six-month period, that things had not gone beyond oral sex, but Austin tried to have intercourse with her and she stopped him. She told Moore she was depressed and had thought about killing herself. Moore testified C.L. did not want Austin to find out she had talked about it. She told Moore, ". . . I don't want him to know. I am afraid. He has a bad temper. He has guns. I don't want him to shoot me." The authorities were notified and C.L. was placed in foster care.

Detective Rich Simmons spoke with Austin on May 12. Simmons falsely suggested the police had recovered DNA evidence that could prove sexual contact between Austin and C.L. Austin denied watching pornographic videos with C.L., but said there were adult videos in the house which she might have watched on her own. He denied there had been any inappropriate touching. He said C.L. occasionally fell asleep in his bed while they were watching movies, but he would make her move to her own bed when she woke up. When Simmons said C.L. had accused him of asking her to sleep in his bed when her mother was away, Austin said that was "a fabrication, pretty much." According to Austin, C.L. "fell asleep a couple of times in the bed. When we're watching movies, she fell asleep." Sometimes he, too, fell asleep and it is possible he could have touched her "if I turned over and put my arm around her, or something like that . . . in my sleep." He denied having ever kissed C.L. in a "suggestive" way.

Simmons spoke to C.L. on May 13. Subsequently, he arranged for her to make two "pretext" telephone calls to Austin, who was out of custody by that time. During the first call, C.L. told Austin her mother had asked her to lie in order to protect him, "but . . . before I lie for you, I want to know why you did this to me." Austin responded: "I thought I was doing what you wanted," "I didn't want to hurt you," "I didn't know I was making you so unhappy,"

and "I'm so sorry." When C.L. asked why he wanted to have a sexual relationship with her, Austin replied: "Well, I was confused. I thought you wanted to."

During the second phone call, C.L. asked what she should say to help him and Austin told her: "[Y]ou just have to say that you exaggerated, and you made it up . . . because you were really unhappy 'cause your mom was in China, and you wanted your mom to come home, and you were mad at me." Austin also said: "[J]ust say you exaggerated, and . . . stuff that you were dreaming, you were telling it like it was real." "[Y]ou don't have to say much. You . . . just say, 'I made it up. I made it up. Uh, it's not true. Wasn't true. I wanted my mom to come home from China.' And then stop. Don't say anything more than that . . . ." "The less you say, the better, and then you shut up, after that." "That's all I can tell you. And don't tell them you talked to me."

Joyce Medley, a marriage and family therapist, testified about child sexual abuse accommodation syndrome (CSAAS). She said children often delay reporting sexual abuse due to feelings of helplessness and entrapment: that children can be afraid of how the report will affect their families. Medley testified it was possible for a sexually abused child to experience an orgasm even if the sexual contact was unwanted: "It is a purely physiological reaction, and if the clitoris gets enough stimulation, there will be an orgasm." One of the coping mechanisms utilized by abused children is dissociation: "Frequently during sexual activity there can be a dissociation. The brain can go elsewhere, but the clitoris is right there."

2. *Defense evidence.*

Austin's biological daughter, Tamara, testified she had never experienced anything inappropriate while living with him.

## CONTENTIONS

1. The trial court erred by relieving defense counsel without giving Austin the choice of waiving a potential conflict of interest.

2. The trial court erred by admitting evidence of C.L.'s pretext phone calls to Austin.

3. The trial court did not properly respond to a jury question during deliberations.

4. CALCRIM No. 1193 incorrectly advised jurors they could consider the expert's testimony about CSAAS in determining C.L.'s credibility.

5. The CSAAS expert's testimony was improper because it went beyond the scope of her expertise.

6. The prosecutor committed misconduct by disparaging Austin during closing argument.

7. The prosecutor committed misconduct by vouching for C.L.'s honesty during closing argument.

8. There was cumulative error.

9. A request for juror identifying information should have been granted.

10. Austin's posttrial *Faretta* motion (*Faretta v. California* (1975) 422 U.S. 806) for self-representation was improperly denied.

## DISCUSSION

1.–4.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

5. *Expert was qualified to offer sexual response opinion.*

Austin contends the prosecution expert lacked the professional qualifications to testify C.L. could have experienced an orgasm during nonconsensual oral copulation. This claim is meritless.

a. *Background.*

The background to C.L.'s testimony about having experienced orgasms during the acts of oral copulation is the following.

After the jury was selected, but prior to opening statements, the prosecutor noted that at the preliminary hearing C.L. had testified she experienced an orgasm during the oral copulation. The prosecutor said, "I am not going to be asking the victim [about] her . . . physiological response to any of the sex acts. [¶] I just want to make sure that this question is not asked by [defense counsel] in front of the jury without first approaching. I just think, based on

---
*See footnote, *ante*, page 731.

the nature of the conflict here and defense's position that this was inappropriate, but consensual contact. My position is it was duress. [¶] So any mention of her physiological response to anything is not relevant . . . and . . . would be very prejudicial . . . ."

The following colloquy then occurred:

"[Defense counsel]: Your Honor, I disagree strongly. [¶] Your Honor, we are saying this was consensual. I don't want to become too graphic, but I do think it's very relevant if somebody enjoys a sexual encounter to determine whether or not it was consensual or not.

"The Court: Wait a minute. [¶] Enjoying a sexual encounter is different than a physiological response. [¶] And . . . you are saying that if she has an orgasm that that ipso facto means that it was consensual, because all orgasms are pleasurable?

"[Defense counsel]: No. [¶] What I'm saying . . . it's relevant. I am saying it's relevant evidence as to whether this was consensual. [¶] I believe as a man of 53 years-old that when people want to engage in sex . . . it is more likely or not that they do achieve orgasm. I believe when they do not want to engage in sex that it tends to follow that they do not achieve orgasm. [¶] I believe that is very relevant to the issue of consensuality [*sic*], and this is evidence that came out of the victim's mouth, and I really think that we are entitled to go into that.

"The Court: Well, notwithstanding your 53 years of experience as a man . . . I do not know that you're qualified to render that opinion. [¶] What you're saying is that every time a rape victim has an orgasm that it's circumstantial evidence of consent. That's what you're saying.

"[Defense counsel]: I think it could be, Your Honor."

The trial court responded: "I disagree with you. I think it's a physiological response. I think you're going to be permitted to ask her whether or not she enjoyed it, whether or not she consented to it. You can explore the circumstances of that. [¶] But the fact that she achieved an orgasm is not relevant to whether or not she was under duress. . . . [¶] I am balancing the factors under [Evidence Code section] 352. It does have probative value, but it is unfairly prejudicial."

This ruling by the trial court was not unreasonable. In *Curtis v. State* (1976) 236 Ga. 362 [223 S.E.2d 721, 723], the Georgia Supreme Court ruled, in a rape case: "The trial court did not err in refusing to allow Curtis' attorney to

ask the prosecutrix whether she experienced orgasm during these acts of intercourse; the answer would have been legally irrelevant to the issue of consent."

However, during the course of C.L.'s trial testimony, the trial court reversed itself and decided the defense should be allowed to ask if C.L. had experienced orgasms during the incidents. That was because during her opening statement to the jury, the prosecutor, while describing the pretext telephone calls, said: "And C.L. said to the defendant 'Why did you do this to me? You have ruined my life,' along those lines. [¶] And the response from the defendant . . . was 'I thought you wanted this. I misread the communications. I wanted you to know what it felt like to have an orgasm.' "

The trial court reasoned the prosecutor's remarks had opened the door to allowing defense counsel to explore the issue: "[T]he basis of C.L.'s testimony and the statement in opening statement about what the defendant said about the orgasm opens the door to putting in whether or not C.L. had an orgasm. [¶] As I understand it, there is some evidence that Mr. Austin said 'I thought she wanted—I thought it was consensual. I wanted her to experience an orgasm.' [¶] The fact that she then does have an orgasm, then to exclude that would be misleading in this case."

Then, during cross-examination, defense counsel asked C.L. if she had experienced an orgasm during the oral copulations. The trial court overruled the prosecutor's objection to the question, and C.L. testified that she had experienced an orgasm each of the four times Austin orally copulated her. C.L. also testified she did not enjoy these orgasms.

Thereafter, the prosecution's CSAAS expert, Joyce Medley, testified: "[A]ny human body is designed to respond to sexual stimulation . . . . The female clitoris has 8,000 nerve endings as opposed to the male penis, which only has 4,000. So the design is there. [¶] If sex didn't feel good, people wouldn't do it, and nature doesn't want that. That's the effective end of the human race. [¶] So the body is designed for stimulation. [¶] It's not always connected to the brain, which may or may not have different thoughts about it. It is a purely physiological reaction, and if the clitoris gets enough stimulation, there will be an orgasm."

In response to the question "[C]an children have a physiological response in that they have experienced an orgasm during a sexual abuse instance," Medley answered, "Yes." At this point, defense counsel objected on lack of foundation grounds. The objection was overruled and the following colloquy occurred:

"Q. By [the prosecutor]: And why is that?

"A. The body is designed to respond sexually.

"Q. Is there some sort of disconnect or something between the brain and the body . . . .

"A. Yes. Frequently during sexual activity there can be a dissociation. The brain can go elsewhere, but the clitoris is right there."

b. *Discussion.*

Austin contends Medley was not qualified to give this testimony because she "is not a physician and has no medical training to speak of," and because her "testimony went far beyond her proposed area of expertise which was child sexual abuse accommodation syndrome." Austin argues he was prejudiced by the admission of this expert testimony because it detracted from his "reasonable belief in her consent" defense: "While C.L.'s orgasmic response may not qualify as retroactive consent, it did serve as circumstantial evidence from which an inference could be raised that C.L.'s initial submission to Austin's acts of oral copulation was either consensual, or more pertinently, gave the appearance of consent, so that Austin had a reasonable belief in C.L.'s consent. Indeed, that C.L. experienced orgasm during the first act of oral copulation was certainly an indication from which Austin could base a belief that, when C.L. subsequently submitted to oral copulation, she was doing so voluntarily in order to achieve further sexual satisfaction."

We conclude the trial court did not err by allowing this expert testimony.

 " 'A person is qualified to testify as an expert if [she] has special knowledge, skill, experience, training, or education sufficient to qualify [her] as an expert on the subject to which [her] testimony relates.' (Evid. Code, § 720, subd. (a).) ' "The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." ' [Citation.]" (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207 [47 Cal.Rptr.2d 800, 906 P.2d 1068], disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344].) "A claim that expert opinion evidence improperly has been admitted is reviewed on appeal for abuse of discretion. [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 131 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

Medley testified she was a licensed marriage and family therapist, a tenured, part-time professor at California State University, Northridge, and

"clinical supervisor at the Valley Trauma Center, which is the sexual assault treatment center affiliated with the university's Department of Education[al] Psychology." As part of her college and graduate-level training, Medley "began to specialize in the area of post-traumatic stress disorder as it relates to victims of sexual assault and other single incident traumatic incidents. [¶] My post graduate training, I did a four year internship at the Rape and Sexual Abuse Center of Ventura County. Since that time I have specialized in the treatment of sexual assault. [¶] I have a broad based practice, but about 40 percent of my practice is related to sexual assault, and about 85 percent of that I work with children, adolescent females who are victims of sexual assault."

Medley testified she had received training in human sexuality "[w]ith part of my undergraduate degree program, part of my . . . master's degree and also as post graduate training. [¶] In addition, I've had 25 years experience of working with sexual assault survivors." Asked about her background, training and experience in relation to "adolescent female[s] . . . and the physiological responses to sex in general," Medley answered: "My undergrad classes and my graduate classes in human sexual behavior dealt a lot on [*sic*] the biology and physiology of sexual response," and "[my] post graduate training has also delved into that."

Austin complains Medley "is not a psychiatrist nor a physician. And yet, she was permitted to testify, not simply to the biomechanics of female sexual response but to the much more psychologically and physiologically nuanced question of whether and how a sexual assault victim may experience an orgasmic response despite the physical stimuli being provided against her will." He asserts, "Medley had done no studies on this subject, nor did she provide any testimony that she had read or known of any studies in the field," and that "[g]eneral training in human physiology or even female sexual anatomy is inadequate for an opinion on the subject of sexual assault victims' physiological response."

But Austin does not apparently know whether Medley conducted studies in the area because that never came up during her testimony. Nor was she asked if she was familiar with studies done by others. Moreover, Austin has not demonstrated that either factor was necessary for Medley to be qualified to give the testimony she did. Austin had the opportunity at trial to question Medley about her qualifications, but he declined to do so. As the Attorney General points out, Austin is simply making a naked assertion about Medley's qualifications.

Austin's reliance on *People v. Davenport, supra*, 11 Cal.4th 1171, and *People v. Fierro* (1991) 1 Cal.4th 173 [3 Cal.Rptr.2d 426, 821 P.2d 1302], in

support of his claim is unwarranted. In *Davenport*, a former police officer tried to offer his opinion as to whether the victim had been impaled by a stake before or after dying. The trial court properly excluded this proposed testimony because the witness "lacked the qualifications necessary to render such an opinion. He had no medical, serology, or pathology training. He had viewed only eight corpses in the two years he had been a homicide investigator, none of which involved a similar injury. He also had only a limited understanding of the manner in which the cause and time of death is clinically determined." (*People v. Davenport, supra,* at p. 1207.)

*Fierro* held the trial court did not abuse its discretion in limiting a witness's testimony to ballistic evidence where the witness "had no training or background in pathology and had never previously testified as an expert in the field[,] had never examined a bullet wound microscopically, conducted tests to determine the effects of a bullet on the human body or removed a bullet from a human body." (*People v. Fierro, supra,* 1 Cal.4th at p. 224.) "The trial court allowed Duncan to testify as a ballistics expert based on his previous experience examining spent projectiles, but determined that Duncan was not qualified to give medical testimony concerning the nature of the victim's injuries or the trajectory pattern of the bullet. [¶] Although one need not necessarily be a licensed physician to give a medical opinion [citation], here it is evident that Duncan was totally deficient in the requisite background, training or experience to state an opinion on the nature or cause of the victim's wounds." (*Ibid.*)

In contrast to these cases, Medley had 25 years' experience working with sexual assault victims, particularly with adolescent girls. She was a part-time professor and the clinical supervisor of a sexual assault trauma center. Medley testified she had received training in human sexual behavior, with specific emphasis on "the biology and physiology of sexual response." Austin has failed to offer either case authority or reasoned argument to show why the trial court abused its discretion by allowing Medley to testify about this subject.

We conclude the trial court did not abuse its discretion by admitting this expert testimony. (See *People v. Catlin, supra,* 26 Cal.4th at p. 131.)

6.–10.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 731.

## DISPOSITION

The judgment is affirmed.

Croskey, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 11, 2013, S213583.