*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0313**

In the Matter of:

Amy Lynn Iverson, petitioner,
Appellant,

vs.

Deven Allen Vanhouse,
Respondent.

**Filed November 10, 2025**
**Reversed and remanded**
**Schmidt, Judge**
**Concurring specially, Harris, Judge**

Lake County District Court
File No. 38-FA-24-143

Tyson S. Smith, Richard T. Furlong III, Smith Law, PLLC, Grand Marais, Minnesota (for appellant)

Leah L. Fisher, Natalie M. Moriarty, Hanft Fride, A Professional Association, Duluth, Minnesota (for respondent)

Anna Street, Tuft, Lach, Jerabek & O'Connell, Maplewood, Minnesota; and

Sami Sexton, Latore Price, Bailey Hovland, Standpoint, St. Paul, Minnesota (for amicus curiae Standpoint)

        Considered and decided by Harris, Presiding Judge; Connolly, Judge; and Schmidt, Judge.

**SCHMIDT**, Judge

Appellant argues that the district court erroneously refused to consider evidence of sexual extortion in the denial of an order for protection (OFP) and made credibility determinations not supported by the record. We reverse and remand.

## FACTS

Appellant Amy Lynn Iverson and respondent Deven Allen Vanhouse were married in 2014 and dissolved their marriage in 2023. The parties have joint legal and joint physical custody of two children.

In February 2024, Iverson experienced housing instability. After talking with Vanhouse and his father—who owned the residence—Iverson and the children temporarily moved in with Vanhouse. Iverson alleged that Vanhouse sexually assaulted her three times while she was living in his house. Both parties agree that the sexual encounters occurred, but Iverson alleged that the encounters were not consensual.

Two days after the third alleged assault, Iverson drove to the police station and made a report in person. Based upon the Police Chief's recommendation, Iverson filed a petition for an OFP. The district court initially granted Iverson an emergency, ex parte OFP and scheduled a hearing. That same day, Iverson and her children received an "eviction notice" giving her 30 days to remove herself, the children, and their belongings from the residence. Approximately twelve hours later, Vanhouse's father cut off the water to the residence, forcing Iverson and the children to immediately move out of the home.

A district court referee held an evidentiary hearing on Iverson's OFP petition. At the hearing, Iverson testified that she was forced to engage in three sexual encounters with Vanhouse under the threat of "eviction." She further testified that when she stopped engaging in the forced sexual encounters, she and her children were forced to leave the home. Vanhouse testified that the sexual encounters were consensual and that he never conditioned Iverson's living situation on having sexual contact with him.

In an order and memorandum—written by the referee and countersigned by the district court judge—the district court denied the OFP. The district court declined to address Iverson's allegations of threats to her housing situation, finding that "[t]he housing issues, and whether eviction laws were followed, is not before the [district court] in the current proceeding." In addressing Iverson's sexual assault allegations, the district court found Vanhouse's testimony was more credible than Iverson's testimony:

> The [district court] finds [Vanhouse's] testimony regarding the consensual nature of the sexual encounters to be more believable than [Iverson's]. [Iverson] never called the police, never reported the activity to friends, admits that she had orgasms during the encounters, and talked nicely about [Vanhouse] on a social media site for single women. The [district court] believes that both parties have regret that they tried to rekindle their sexual relationship, but the [district court] does not believe the encounters were abusive.

Iverson filed a motion for amended findings, asking the district court to reevaluate the issue of her housing insecurity. The district court denied Iverson's motion, finding that Iverson's "testimony at trial did not give rise to a credible threat of housing insecurity."

Iverson appeals.

**DECISION**

The Domestic Abuse Act creates "an action known as a petition for an order for protection." Minn. Stat. § 518B.01, subd. 4 (2024). The petition must "allege the existence of domestic abuse, and shall be accompanied by an affidavit made under oath stating the specific facts and circumstances from which relief is sought." *Id.*, subd. 4(b). The statute defines "domestic abuse" as "(1) physical harm, bodily injury, or assault; (2) the infliction of fear of imminent physical harm, bodily injury, or assault; or (3) . . . sexual extortion[.]" *Id.*, subd. 2(a) (2024). The petitioner must show that a preponderance of the evidence supports issuing the OFP. *Isenhower v. Isenhower*, 993 N.W.2d 91, 94 (Minn. App. 2023).

We review a district court's OFP decision for an abuse of discretion. *Thompson v. Schrimsher*, 906 N.W.2d 495, 500 (Minn. 2018). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *Id.* (quotation omitted). Questions of statutory interpretation are reviewed de novo. *Id.* at 498. "The findings of a referee, to the extent adopted by the [district] court, shall be considered as the findings of the [district] court." Minn. R. Civ. P. 52.01. "A district [court] judge's findings of fact are not set aside unless clearly erroneous." *Knapp v. Knapp*, 883 N.W.2d 833, 835 (Minn. App. 2016) (quotations omitted).

**I.     The district court erred in refusing to consider evidence of sexual extortion.**

The district court declined to address Iverson's housing insecurity or the pending "eviction" issues because it determined that those issues were not properly before the court in the OFP proceeding. Iverson argues that the district court erred by concluding that her housing issues were irrelevant to the OFP matter. We agree.

4

Under the Domestic Abuse Act, a district court may issue an OFP if there is "sexual extortion" within the meaning of Minnesota Statutes section 609.3458 (2024), which provides that:

> A person who engages in sexual contact with another person and compels the other person to submit to the contact by making any of the following threats, directly or indirectly, is guilty of sexual extortion . . . *a threat to withhold complainant's housing, or to cause complainant a loss or disadvantage in the complainant's housing*, or a change in the cost of complainant's housing.

Minn. Stat. § 609.3458, subd. 1(6) (emphasis added).

The sexual-extortion statute—as referenced by the Domestic Abuse Act—expressly includes acts or threats directed at a complainant's housing. *See* Minn. Stat. § 609.3458, subd. 1(6). The housing issues were, therefore, properly before the district court in the OFP proceedings, at least to the extent that Iverson alleged the asserted sexual contact occurred under a threat to withhold, cause her to lose, or otherwise be disadvantaged in obtaining or retaining housing. The district court erred in determining otherwise.

The district court also viewed Iverson's housing insecurity allegations within the wrong timeframe. The district court focused on the period when Iverson received a notice of "eviction" from Vanhouse's residence. But Iverson alleged her housing insecurity issues began *before* she moved in with Vanhouse. Iverson alleged that at the time she moved in with Vanhouse, she was unhoused with two children and had limited financial means. Iverson alleged that she moved in at the encouragement of Vanhouse. Iverson alleged that after moving in with Vanhouse she was coerced into the sexual encounters out of fear of losing housing for herself and her two children.

5

On this record, we cannot determine whether the three alleged sexual encounters or Iverson's refusal to engage in further sexual contact fall within the scope of "sexual extortion" in the Domestic Abuse Act. On remand, the district court must consider Iverson's allegations within the context of the sexual-extortion statute and analyze the housing issues starting from before Iverson moved in with Vanhouse.

**II.     The district court clearly erred in some of its findings of fact.**

Iverson argues the district court abused its discretion in denying the OFP petition based upon a determination that Iverson consented to the sexual encounters. Iverson contends that the district court's credibility determinations must be reversed because the factual findings underlying those determinations were clearly erroneous. We agree.

Generally, we defer to a district court's credibility determinations because the district court is "in the best position to determine which witnesses are credible and to weigh the evidence" when addressing factual issues with conflicting testimony. *Haefele v. Haefele*, 621 N.W.2d 758, 763 (Minn. App. 2001), *rev. denied* (Minn. Feb. 21, 2001). Because appellate courts do not disturb a district court's credibility determinations, our review is limited to whether the district court's determination is supported by the evidence as a whole. *See In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021).

In finding that Vanhouse's testimony was more credible than Iverson's testimony regarding the consensual nature of the sexual encounters, the district court made four factual findings:

> (1)     Iverson "never called the police";
>
> (2)     Iverson "never reported the activity to friends";

   (3)  Iverson admitted "that she had orgasms during the encounters"; and

   (4)  Iverson "talked nicely about [Vanhouse] on a social media site for single women."

Our thorough review of the record reveals that none of these underlying factual findings, upon which the credibility determination was based, are "reasonably supported by the evidence as a whole." *Id.*

 First, the record conflicts with the district court's finding that Iverson "never called the police." Two days after the third alleged assault, Iverson drove to the police station to make a report. The Police Chief recommended that Iverson file an OFP petition, which she did. While Iverson did not contact the police by using a phone (*i.e.*, Iverson did not actually *call* the police), the district court's implicit finding that Iverson never contacted the police is clearly erroneous.[1]

 Second, the district court's finding that Iverson never told her friends about the assaults has no support in the record. The testimony is silent on this issue. Vanhouse's counsel candidly conceded at oral argument before this court that the record was silent on whether Iverson reported her assaults to friends.[2] Given the lack of any record support, this finding is clearly erroneous.

---

[1] The fact that Iverson did not report the prior alleged assaults is consistent with the unfortunate statistics about the reporting of domestic abuse incidents. *See State v. Tapper*, 993 N.W.2d 432, 448 (Minn. 2023) ("[L]ess than half of domestic abuse incidents are even reported.") (Chutich, J., dissenting).

[2] We appreciate counsel's candor on this point.

Third, the finding that Iverson experienced any orgasm during these encounters is not an appropriate basis upon which to make a credibility finding. Experiencing an orgasm during a sexual assault is not evidence of consent. *See Curtis v. State*, 223 S.E.2d 721, 723 (Ga. 1976) (affirming prohibition of asking whether victim experienced an orgasm during sexual assault because "the answer would have been legally irrelevant to the issue of consent"). As Standpoint notes in their *amicus curiae* brief, an orgasm is a purely physiological response. *See* Roy J. Levin & Willy van Berlo, *Sexual arousal and orgasm in subjects who experience forced or non-consensual sexual stimulation—a review*, 11 J. of Clinical Forensic Med., 82 (2004); *see also* Mariève Vandervoort et al., *Victim Sexual Arousal During Nonconsensual Sex: A Scoping Review*, 53 Archives Sexual Behav., 2305 (2024). Iverson's physiological responses to the encounters have no bearing as to whether the encounters were consensual.

Finally, the district court's characterization of Iverson's social media post lacks record support. Iverson posted the following on a social media site:

> This is my ex husband . . . You'll be charmed right off the bat.
> Super easy to chit chat with; but he can't hold an important
> conversation. He's using Tinder for its intended purpose, he's
> not looking for a relationship.

There is no testimony to support the district court's characterization that Iverson's social media post "talked nicely" about Vanhouse. And the district court's own characterization about the post is tenuous and lacks support in the record evidence.

As a reviewing court, we do not make factual findings, and we take no position as to whether the OFP should be granted on remand or whether the alleged assaults were

8

consensual. But on remand, the district court cannot rely on any of the same four credibility determinations cited in its order. Within its discretion, the district court may, however, reopen the record in considering Iverson's OFP petition.

**Reversed and remanded.**

**HARRIS**, Judge (concurring specially)

Although I concur in the reasoning and result reached by the majority, I write separately to express my concern regarding the district court's credibility findings. As the majority makes clear, the district court's credibility determinations lack factual support in the record. But what I find concerning is that the district court's credibility findings appear consistent with several sexual-assault myths.[1] In Minnesota, "one in every three women will experience violence, rape, or stalking by an intimate partner in their lifetime." *See Johnson v. Freborg*, 995 N.W.2d. 374, 391 (Minn. 2023) (citing *Domestic Violence in Minnesota*, Nat'l Coal. Against Domestic Violence (2020)). As the amicus brief[2] points

---

[1] Sexual-assault myths are "prejudicial, stereotyped, or false beliefs about rape, rape victims, and rapists." *See State v. Obeta*, 796 N.W.2d 282, 289 (Minn. 2011) (citing Amy M. Buddie & Arthur G. Miller, *Beyond Rape Myths: A More Complex View of Perceptions of Rape Victims*, 45, 45 Sex Roles 139–40 (2001); *see also* Suzanne St. George Cobel et al., *Detectives' Descriptions of Their Responses to Sexual Assault Cases and Victims: Assessing the Overlap Between Rape Myths and Focal Concerns*, Police Quarterly, Vol. 25(I), 90-117 (2022) (noting rape myths generally fall into three categories: (1) myths about victim/survivor credibility, such as beliefs that women often lie about rape when they regret consensual sex or to seek revenge against an ex-partner; (2) myths about victim/survivor precipitation (how interactions between a victim/survivor and their abusers influence the abuse), such as beliefs that women who dress provocatively invite rape; and (3) myths about what type of rape "counts", such as beliefs that true rape only occurs when a stranger uses force, and when the victim/survivor resists, is injured, and reports the crime immediately.). The term rape myth and sexual-assault myth are used interchangeably. For ease of reading, I use the term sexual-assault myth. These myths are contrary to established research on the experiences of victim/survivors of sexual assault *See* Isabella Payne et al., *Rape and Sexual Assault: Annual Review of Gender and the Law*, 26 Geo. J. Gender & L. 859, 866-68 (2025).

[2] Standpoint filed the amicus brief. Standpoint is a private nonprofit organization serving as a statewide agency providing legal consultation, training, and resources to victims/survivors of domestic sexual violence and their advocates, attorneys, and systems professionals.

out, when the judicial system utilizes sexual-assault myths in witness credibility evaluations, it legitimizes the myths and signals to victim/survivors that they will not be taken seriously if they do not conform to a particular view of how a victim/survivor should act. Given the prevalence of sexual assault, the utilization of sexual-assault myths in credibility evaluations erodes access to justice.

I recognize that the factfinder is generally in the best position to assess the credibility of testimony because it can directly evaluate the content of the testimony, the manner in which it is delivered, and the demeanor and sincerity of the witness through whom it is given. *See In re Welfare of A.D.*, 535 N.W.2d 643, 648 (Minn. 1995) (noting that the district court stands in a superior position to appellate courts in assessing credibility of witnesses); *see also In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221-23 (Minn. 2021) (discussing, in detail, the clear error standard of review, including that appellate courts neither weigh nor reweigh evidence); *Butler v. Jakes*, 977 N.W.2d 867, 872 (Minn. App. 2022) (citing *Kenney* in an OFP appeal). As such, we are required to give deference and due regard to the district court's credibility determinations. *See Wilson v. Wilson*, 11 N.W.2d 331, 337 (Minn. App. 2024) ("Considerable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses."). But for appellate courts to properly defer to the district court's credibility determinations, its findings must rest on the actual credibility of witness testimony—not on discredited myths or unfounded assumptions.

In its September 4, 2024 order, the district court denied the petition for an order for protection, finding "[Vanhouse's] testimony regarding the consensual nature of the sexual

encounters to be more believable than [Iverson's]." Because "[Iverson] never called the police, never reported the activity to friends, admit[ted] that she had orgasms during the encounters, and talked nicely about [Vanhouse] on a social media site for single women."

In its February 2025 order, the district court denied Iverson's motion for amended findings noting its September 2024 order "was largely based on the credibility of witnesses' testimony at trial." These credibility findings are troubling because: (1) they belie uncontroverted testimony in the record and (2) rely on outdated myths and stereotypes about sexual assault victim/survivors, including that true victim/survivors would call the police immediately; report the assault to friends, family, and even strangers; and be able to prevent the biological process of orgasm during the assault. I address each finding in turn.

***Credibility findings regarding Iverson's reporting to the police***

The district court's finding that Vanhouse's testimony regarding the consensual nature of the sexual encounters was more believable than Iverson's because Iverson never called the police is flawed for multiple reasons. First, as stated by the majority, it is contrary to the record. Second, the district court made an unsupported assumption when it concluded that because Iverson did not call the police, she must have consented. This inference is a logical step too far. Because the majority already explains that the finding is not supported by the record, I will focus here on the logical leap made by the district court.

The logical structure of the district court's credibility finding is that Iverson's act of not calling the police was an overt action indicating a freely given present agreement to perform a particular sexual act with Vanhouse. This finding is alarming because it perpetuates a myth about consent and sexual assault. Even if Iverson never called the

police, there are several reasons—unrelated to whether she consented—that a person might not report the sexual assault to law enforcement. Those reasons include fear of retaliation, a belief that the police would not help, fear of homelessness for her and her children, and a desire to avoid getting the perpetrator in trouble. In fact, the record contains unrebutted testimony from Iverson that she did not call the police after the first two sexual assaults "out of fear." In reference to her fear for the safety of her and her children Iverson stated that she was "afraid for [her] own, just the retaliation in housing, and then who wants to bring their kids into a situation like that?" She also testified that immediately after the April 5th sexual assault she did not call the police because she "didn't want [her] kids to walk out to that." The district court's conclusion— that not contacting law enforcement undermines Iverson's credibility—lacks factual support in the record. The district court's only support for this conclusion rests on archaic myths about sexual assault.

### *Credibility finding regarding Iverson not telling friends and family*

Next, the district court found that Vanhouse's testimony regarding the consensual nature of the sexual encounters was more believable than Iverson's because Iverson did not tell friends and family about the sexual assaults. Again, this finding is not supported by the record.

There was no evidence in the record about whether Iverson told friends and family about the sexual assault. I find it concerning that the district court assumed—again, without evidence—that Iverson did not report the sexual assault to friends and family and then used that unfounded assumption to determine that the lack of reporting made her less credible on the issue of consent. Even if Iverson had not reported the assaults to friends

and family, there are several possible reasons for this lack of disclosure that are unrelated to whether she consented.[3] By assuming that she did not report the sexual assault to friends and family and then connecting the lack of reporting to her credibility regarding consent, without any additional analysis or support in the record, the district court's conclusion that the lack of reporting to friends and family weighs against Iverson's credibility is not supported by the record and is consistent with sexual-assault myths about how a victim should act.

### *Credibility finding regarding Iverson's social media post*

Next, the district court found that Vanhouse's testimony regarding the consensual nature of the sexual encounters was more believable than Iverson's because Iverson "talked nicely about [Vanhouse] on a social media site for single women." As the majority notes, the district court's characterization about the social media post is tenuous.[4] It is problematic that the district court doubted Iverson's credibility on the issue of consent because she did not speak publicly on social media about a sexual assault.

---

[3] The amicus brief cites to studies noting that it is common for victims/survivors of sexual assault to not report the assault to friends and family. *See* Karen G. Weiss, *Too Ashamed to Report: Deconstructing the Shame of Sexual Victimization*, Feminist Criminology, Vol. 5, Issue 3, 286-310 (2010); *See Also* Padideh Hassanpour et. al., *Sexual Violence and Shame: A Meta-Analysis, Trauma, Violence, and Abuse*, Jan. 2025.

[4] Iverson argues the district court misinterpreted her post as nice because the subtext of her post was: "be warned; he can be charming, but he's stupid, and he's just looking for sex." The post in question was posted to a social media page for single women and said: "This is my ex-husband [] You'll be charmed right off the bat. Super easy to chit chat with; but he can't hold an important conversation. He's using Tinder for its intended purpose, he's not looking for a relationship."

### *Credibility finding regarding Iverson having an orgasm*

Finally, the district court found that Vanhouse's testimony regarding the consensual nature of the sexual encounters was more believable than Iverson's because she "had orgasms during the encounters." In making this finding, the district court appeared to conclude that Iverson was less credible because the process of having an orgasm was an overt action that indicated a freely given present agreement to perform a particular sexual act with Vanhouse.[5] This conclusion is nothing short of alarming, both in its logic and in its broad implications for the law's treatment of sexual-assault survivors.

As the majority notes, "a victim of a sexual assault who experiences an orgasm during the assault is not evidence of consent. An orgasm is a purely physiological response." While Minnesota courts have never addressed this physiological response regarding consent, other courts have relied on current research when determining that an orgasm during a sexual encounter is not indicative of consent. *See People v. Austin*, 161 Cal. Rptr. 3d 883, 886-892 (Cal. Ct. App. 2013) (concluding district court did not abuse its discretion by allowing expert to testify that victim could have experienced orgasm during nonconsensual encounter);[6] *see also Curtis v. State*, 223 S.E.2d 721, 723 (Ga. App. 1976) (holding district court did not err in precluding the defense from asking victim if she

---

[5] *See* Minn. Stat. § 609.341, subd. 4(a) (2024) (defining consent as "words or overt actions by a person indicating a freely given present agreement to perform a particular sexual act with the actor.")

[6] Though not binding on Minnesota courts, authorities from other states or federal courts can be persuasive. *State v. McClenton*, 781 N.W.2d 181, 191 (Minn. App. 2010), *rev. denied* (Minn. June 29, 2010).

experienced an orgasm during sexual assault, as the "answer would have been legally irrelevant to the issue of consent").

Here, Iverson testified that she verbally denied her ex-husband's sexual advances, consistently making clear statements like, "I don't want to do this," "We are not having sex," "We're not having sex right now," "No, don't," "We are not doing this right now," and "No, absolutely not."[7]  And the district court does not address these statements made by Iverson.  Rather, it noted in part, that because these unwanted sexual advances resulted in an orgasm, Iverson consented.  The district court's reasoning suggests that Iverson's purely physiological response negated her refusal to consent—this is legally and profoundly misguided.  And given the lack of analysis in the district court's order regarding the testimony of the parties, one is left with the only conclusion that the district court credited the testimony of Vanhouse, not because he was mostly credible, but because, in part, Iverson had an orgasm during the sexual acts.  The district court's reliance on Iverson's orgasm as evidence of consent was contrary to logic and facts in the record and was a clear abuse of discretion.

I will end where I began. We are required to give deference and due regard to the district court's credibility determinations.  However, with the deference we afford the district court in making credibility determinations comes a responsibility that those credibility determinations are, in fact, assessing the credibility of individual witnesses. Sexual assault cases are mired in complex relationship and power dynamics and shadowed

---

[7] Vanhouse admitted to many of the acts that Iverson described, but claimed they were consensual.

by outdated social and cultural attitudes about sexual violence. As the amicus brief points out, if we allow these types of findings to stand it would have a wide-reaching effect on victim/survivors of sexual assault who seek orders for protection. Here, the district court's findings that are consistent with sexual-assault myths were contrary to the evidence and established research on the experiences of victims/survivors of sexual assault. The reasoning adopted by the district court is not only clearly erroneous, but it runs afoul of the dignity and respect the law owes to every individual.

Minnesota courts strive to reach the right decision based on record evidence, and there should be no room for courts to base its determinations on unsupported assumptions. "To maintain public trust and confidence in the judiciary, judges should . . . act to assure that parties have no reason to think their case is not being fairly judged." *Pederson v. State,* 649 N.W.2d 161, 164-65 (Minn. 2002). Making credibility findings that are not supported by the record but are consistent with outdated sexual-assault myths strikes at the very heart of the public trust. If this is allowed to stand, we risk that the people who most need the protection of the court may choose not to seek this protection for fear of being subjected to these archaic myths. To maintain the public's trust and confidence in the judiciary, we must do better.