Filed 9/4/15  Mares v. Chrysler Group LLC CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HETHALEIN MARES et al., | B249272 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. GC044931) |
| v. | |
| CHRYSLER GROUP LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, C. Edward Simpson, Judge.  Affirmed.

Sedgwick LLP, Philip R. Cosgrove, Hall R. Marston and Ryan E. Cosgrove for Defendant and Appellant.

Bisnar | Chase, Brian D. Chase and Jill P. McDonell for Plaintiffs and Respondents.

_____

## INTRODUCTION

Following a strict products liability jury trial regarding a minivan fire, Defendant and Appellant FCA US LCC (formerly known as Chrysler Group LLC and hereinafter referred to as Chrysler) appeals the judgment entered in favor of Plaintiffs and Respondents Stephen A. Mares, Stephen J. Mares, Hethalein Mares, Seth Mares, and Sophia Mares. Chrysler argues that the judgment requires reversal because: (1) the court erred when it instructed the jury on the consumer expectation test rather than the risk/benefit test to establish Chrysler's liability for Plaintiffs' product defect claim, (2) the court improperly instructed the jury during deliberations regarding the subject matter of the consumer expectation test, (3) Plaintiffs' accident reconstruction expert's opinion lacked evidentiary support, (4) Plaintiffs' expert showed the jury an inaccurate animation of how the vehicle fire occurred, (5) the court improperly excluded Chrysler's evidence regarding the absence of similar vehicle fires, and (6) the jury committed misconduct by considering evidence outside the record. We conclude that the court properly instructed the jury on the consumer expectation test, the jury committed no misconduct requiring reversal, and the court did not abuse its discretion in making the evidentiary rulings admitting testimony and an animation from Plaintiffs' expert and excluding Chrysler's evidence of the absence of similar incidents. We thus affirm.

## FACTS AND PROCEDURAL BACKGROUND

In October 2009, Stephen A. Mares[1] was driving a 1998 Dodge Caravan on Interstate 5 in Irvine California. Stephen's wife, their two minor children, and Stephen's father were passengers in the Caravan. All five family members are Plaintiffs in this case. While driving 72 miles per hour, the left rear tire suddenly suffered tire tread separation. Stephen then drove the Caravan across several lanes of traffic to make an emergency stop on the right shoulder of the highway. A trail of fire followed the Caravan across the lanes until it came to a stop on the shoulder. Almost immediately

---

[1] We refer to Stephen A. Mares by his first name for the sake of clarity and not out of disrespect.

2

after stopping, flames engulfed the bottom and sides of the Caravan. Although all five family members survived, Stephen and his father struggled to free the children from their car seats during the fire. Stephen, his father, and the children suffered second and third degree burns. Plaintiffs subsequently sued Chrysler for strict products liability and negligent infliction of emotional distress, among other causes of action.[2]

The strict product liability claim was tried before the jury. Plaintiffs alleged that the fuel tank and the filler neck assembly of the Caravan were defective. Plaintiffs moved in limine to proceed solely under the consumer expectation test, rather than the risk benefit test, to prove the product defect claim. Defendants opposed the motion, asserting that the consumer expectation test was inappropriate because Plaintiffs' theory of design defect was too technical and mechanical, and thus beyond the common experience and knowledge of the consumer. The trial court, however, agreed with Plaintiffs, granted Plaintiffs' motion in limine, and later instructed the jury on the consumer expectation test and not on the risk/benefit test.

Plaintiffs' theory of the case involved the vehicle's tire tread damaging the fuel system. At trial, Plaintiffs used three experts to explain their design defect theory to the jury: (1) a forensic consultant in tire litigation who discussed the tire tread separation, (2) a mechanical engineer who explained how the fender liner moved and the fuel system fell apart in multiple places, and (3) a fire and explosion investigator who explicated the causes of the vehicle fire. The experts explained the causes of the fire and the fuel system defect as follows.

First, the left rear tire suffered tread separation, and the tire tread displaced the inner fender liner. The displaced fender liner exposed the fuel filler neck to the damaged and shredded tire treads. The fuel filler neck is the tubing system through which fuel enters the vehicle and is transported to the fuel tank when a consumer fills the vehicle with gasoline. The shredded tire treads caught on the filler neck near the vehicle's gas cap and pulled the filler neck down towards the ground. The tire treads also separated the

---

[2]    Plaintiffs' other claims are not at issue on appeal, and we thus do not discuss them.

fuel filler neck from the spud that attached the filler to the fuel tank. Liquid gasoline then escaped from the fuel tank and vaporized. The gasoline vapors were ignited by friction sparks from either the steel wires woven into the tire tread or from the metal rim of the wheel hitting the road. The ignited vapors created the visible trail of fire on the road behind the Caravan as Stephen maneuvered the vehicle to the right shoulder of the interstate. Plaintiffs' mechanical engineer and vehicle design expert Stephen Syson showed the jury an animation illustrating this theory of how the tire tread displaced the fuel filler neck.

Chrysler also presented several experts and an alternative theory of how the automobile fire occurred. Over Chrysler's objection, the court excluded testimony that there had not been any similar vehicle fire incidents involving this make and model of minivan. The jury returned a verdict in favor of Plaintiffs, awarding a total of $915,000 in compensatory damages to Plaintiffs. Chrysler moved for a new trial and for judgment notwithstanding the verdict. In the motion for new trial, Chrysler asserted that juror misconduct required reversal because one juror improperly presented external evidence to the jury. The motion also asserted that the court improperly gave the jury conflicting instructions regarding the consumer expectation test, and the court erroneously excluded Chrysler's absence of similar incidents evidence. The trial court denied both motions.

## DISCUSSION

### 1. *The Court Properly Applied the Consumer Expectation Test*

Chrysler asserts that the court erred in instructing the jury on the consumer expectation test rather than the risk/benefit test. We review de novo the trial court's decision to instruct the jury on the consumer expectation test. (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1374; *Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 766.) Instructional error warrants reversal only if the "error caused actual prejudice in light of the whole record." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 (*Soule*).)

At issue is the appropriate instruction regarding design defect product liability under the particular facts of this case. In *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 (*Barker*), the Supreme Court explained that in product design defect cases, a manufacturer can be strictly liable for resulting injuries, "under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design."

The first test, commonly called the consumer expectation test, "is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design." (*Soule, supra,* 8 Cal.4th at p. 567, italics omitted.) "Under that test, 'a plaintiff is required to produce evidence of the "objective conditions of the product" as to which the jury is to employ its "own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." [Citation.]' [Citation.]" (*Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 717.)

"In a jury case, the trial court must initially determine, as a question of foundation and in the context of the facts and circumstances of the particular case, whether the product is one about which the ordinary consumer can form reasonable minimum safety expectations." (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1125-1126, fn. 7 (*McCabe*).) "Unless the facts actually permit an inference that the product's performance did not meet the minimum safety expectations of its ordinary users, the jury must engage in the balancing of risks and benefits required by the second prong of *Barker*." (*Soule, supra,* 8 Cal.4th at p. 568.) Thus, to determine whether the court erred by instructing the jury on the consumer expectation test, we assess "whether

5

the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Id.* at pp. 568-569.)

Chrysler asserts that "*Soule* and its progeny make clear that [the consumer expectation test] should not have been applied under the *evidence* presented." In *Soule, supra,* 8 Cal.4th at page 556, the plaintiff was injured in an automobile collision, where her vehicle's front wheel broke free, collapsed rearward, and smashed the vehicle's floorboard into her ankles. The Supreme Court determined that the plaintiffs' theory of the design defect involved matters that were not subject to ordinary consumer expectations. (*Id.* at p. 570.) The Supreme Court held that "the instant jury should not have been instructed on ordinary consumer expectations. [The p]laintiff's theory of design defect was one of technical and mechanical detail. It sought to examine the precise behavior of several obscure components of her car under the complex circumstances of a particular accident. The collision's exact speed, angle, and point of impact were disputed." (*Ibid.*) The Supreme Court explained: "An ordinary consumer of automobiles cannot reasonably expect that a car's frame, suspension, or interior will be designed to remain intact in any and all accidents. Nor would ordinary experience and understanding inform such a consumer how safely an automobile's design should perform under the esoteric circumstances of the collision at issue here." (*Ibid.*)

*Soule* is distinguishable because the present case does not involve esoteric circumstances within which consumers would lack expectations of their vehicle's performance. Rather, this case involves a common-place tire separation. An ordinary consumer of automobiles can reasonably expect that when their tire tread separates, the tire tread will not cause a fire within the fuel system. The Supreme Court in *Soule* also stated that "[i]n particular circumstances, a product's design may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers. In such cases, a lay jury is competent to make that determination." (*Soule, supra,* 8 Cal.4th at p. 569.) This is one of those circumstances. Here, the vehicle performed so unsafely during the tire tread separation, that the defect was obvious and

6

apparent to any consumer. An ordinary consumer would not expect their vehicle's fuel system to be severely compromised by a tire tread separation, nor would that consumer expect their vehicle to be engulfed in flames as a result of a tire tread separation.

In *Akers v. Kelley Co.* (1985) 173 Cal.App.3d 633, 641, disapproved on another ground in *People v. Nesler* (1997) 16 Cal.4th 561, 582, footnote 5, the Court of Appeal evaluated the applicability of the consumer expectation test to a dockboard, "essentially an adjustable platform designed to bridge the gap between a stationary loading dock and the rear end of a freight-carrying truck or van." Several hours after a forklift struck the dockboard, the dockboard flew apart and injured a worker. (*Akers v. Kelley Co.*, at p. 644.) The trial court instructed solely on the consumer expectation test and the Court of Appeal affirmed. (*Id.* at p. 648.) The Court explained that "[t]here are certain kinds of accidents—even where fairly complex machinery is involved—which are so bizarre that the average juror, upon hearing the particulars, might reasonably think: 'Whatever the user may have expected from that contraption, it certainly wasn't that.' Here, a dockboard flew apart and injured [the worker]. A reasonable juror with no previous experience of dockboards could conclude that the dockboard in question failed to meet 'consumer expectations' as to its safety." (*Id.* at p. 651.)

Likewise the vehicle fire caused by a tire tread separation in this case was so abnormal and dangerous, that the average, reasonable juror could easily conclude that the minivan failed to meet consumer expectations. As the Supreme Court in *Soule* explained: "the ordinary consumers of modern automobiles may and do expect that such vehicles will be designed so as not to explode while idling at stoplights, experience sudden steering or brake failure as they leave the dealership, or roll over and catch fire in two-mile-per-hour collisions. If the plaintiff in a product liability action proved that a vehicle's design produced such a result, the jury could find forthwith that the car failed to perform as safely as its ordinary consumers would expect, and was therefore defective." (*Soule, supra,* 8 Cal.4th at pp. 566-567, fn. 3.) Here, a reasonable juror could conclude that a tire tread separation should not result in a flames engulfing the vehicle.

7

Therefore, we conclude that the court did not err in granting Plaintiffs' motion in limine, allowing Plaintiffs to proceed on the consumer expectation test theory, and in instructing the jury on the consumer expectation test rather than the risk/benefit test.[3]

## 2. The Court Properly Responded to the Jury's Question by Identifying the Vehicle as the Subject of the Consumer Expectation Test

Chrysler argues that the Court erred in its response to a juror question during deliberations and that such error requires reversal. At issue is a juror question regarding the special verdict form. The special verdict form queried: "Did the design of the fuel system on Stephen A. Mares' vehicle fail to perform as safely as an ordinary consumer would have expected at the time of the incident?" On the first day of deliberations, the jury asked whether they had to decide "that there was a design defect in the fuel system" and "that the fire started the way the [P]laintiffs claimed." The court discussed a proper response with counsel, and responded in writing as follows: "A vehicle is defective if it did not perform as an ordinary consumer would have expected it to perform under the circumstances. You do not need to decide whether there was a design defect in the fuel system. However, to decide whether the vehicle performed as an ordinary person would have expected it to perform you will have to decide how the fire started." Chrysler

---

[3]    We note that Chrysler asserts that the trial court's application of the consumer expectation test was procedurally defective. Chrysler argues that the jury was required to first determine whether the consumer expectation test applied to this case before addressing whether the product's safety fell below consumer expectations. The procedure advocated for by Chrysler comes from dicta within a footnote in *McCabe, supra*, 100 Cal.App.4th at page 1125–1126, footnote 7. This statement in *McCabe* appears to be an outlier in California case law, and has been cited by only two published Court of Appeal cases, *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1310-1311, footnote 10, and *Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1233-1234. We find the legal basis for this statement in *McCabe* questionable. Moreover, the jury effectively determined that the consumer expectation test applied to these facts when it concluded in a 10-to-two vote that the product failed to satisfy consumer expectations. Thus, there was no procedural error associated with application of the consumer expectation test requiring reversal under these facts.

8

contends that "[t]he Court's about face regarding the specification of the defective product was reversible error." We disagree.

"The court's duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision. [Citation] A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law. [Citation.]" (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553.) "We review challenges to the propriety of jury instructions in correctly stating the relevant law under the de novo standard of review. [Citation.]" (*Collins v. Navistar* (2013) 214 Cal.App.4th 1486, 1500.) "Not all instructional errors require reversal and a new trial. To obtain a reversal, an appellant must establish that the error was prejudicial." (*Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 613.) This means that it must appear reasonably probable that without the instructional error, the jury's verdict would have been more favorable to Defendants. (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1540.) " 'Here the question is, how would a reasonable juror understand the instruction. [Citation.] In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.' [Citation.]" (*People v. Woodward* (2004) 116 Cal.App.4th 821, 834.)

We conclude that there was no error in the trial court's instruction identifying the subject of the consumer expectation test as the vehicle, rather than the fuel system. Pursuant to CACI 1203, a plaintiff must prove that "That the [*product*] did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way." (Italics and bracketed language in original.) Similarly, CACI verdict form VF-1201, which sets forth questions for the consumer expectation test, asks the jurors: "Did the [*product*] fail to perform as safely as an ordinary consumer would have expected when used or misused in an intended or reasonably foreseeable way?" (Italics and bracketed language in original.) The model

9

jury instruction and verdict form clearly identify the entire product as the subject matter of consumer expectation test, not merely one component of the product.

Case law likewise states that the jury is to determine whether the product itself fails to meet consumer expectations as to safety. (*Soule, supra,* 8 Cal.4th at p. 562 [a product is defective in design if it does fail to perform as safely as an ordinary consumer would expect]; *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1311-1312 (*Pannu*) [" 'The critical question, in assessing the applicability of the consumer expectation test, is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the consumer, but whether the product, *in the context of the facts and circumstances of its failure*, is one about which the ordinary consumers can form minimum safety expectations.' "]; *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118 [" 'a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.' (Citation.) This standard reflects a warranty analysis and is based on the theory that when a manufacturer places a product on the market, a representation is impliedly made that the product is safe for the tasks it was designed to accomplish."]; *Barker, supra,* 20 Cal.3d at p. 435 ["We hold that a trial judge may properly instruct the jury that a product is defective in design . . . if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner"].)

Thus, the court's response correctly instructed the jury to consider the entire vehicle in determining whether it met the consumer's safety expectations. The model jury instruction, model special verdict form, as well as case law indicate that this was the correct inquiry. The special verdict form in this case was inaccurate to the extent that it asked the jury to determine whether "the design of the fuel system" failed to perform as safely as an ordinary consumer would expect. We nonetheless conclude that this inaccuracy did not prejudice Chrysler. Here, the jury instructions specifically informed the jurors that in order for Plaintiffs to prove that the vehicle was defective, they had to

10

prove "[t]hat *the vehicle* did not perform as safely as an ordinary consumer would have expected at the time of use." (Italics added.) As explained above, this is the correct instruction to issue to the jury. Moreover, the court reiterated this instruction when it responded to the jury's questions during deliberation.

To the extent the special verdict form specified a particular part of the vehicle (the fuel system) in asking whether it met consumer safety expectations, this did not prejudice Chrysler. Rather, the impact, if any, of the special verdict form specifying the fuel system as the subject of the consumer expectation test was to make it more difficult for Plaintiffs to prove their case because the form prompted the jury to focus on a particular part of the vehicle rather than consider the vehicle in general.

Based on the foregoing, we conclude that there was no instructional error requiring reversal.

**3.       The Court Properly Admitted Syson's Opinion and Animation**

Chrysler advances two arguments regarding the expert opinion provided by Plaintiffs' mechanical engineer and vehicle design expert, Stephen Syson. First, Chrysler asserts that Syson's opinion lacked foundation because he could not determine the dimensions of the tire tread separation. Second, Chrysler argues that the court wrongfully permitted Syson to show his animation of the accident reconstruction to the jury because his opinion lacked foundation and the animation was inaccurate.

*a.       Tire Tread Separation Dimensions*

Plaintiffs' expert Syson concluded that the left rear tire separation moved the wheel-well's inner liner, grabbed the fuel filler neck, and disconnected it from the gas tank spud, spilling gasoline which then vaporized and ignited. Chrysler argues that although the cornerstone of Syson's opinion was that the tread separation was of sufficient length, width, and weight to move the inner liner, and grab and dislodge the fuel filler neck, there were no proven facts for Syson's deductions regarding the dimensions of the tire tread and thus Syson's opinion lacked foundation. Chrysler argues that "Syson made up the dimensions of a hypothetical separated tread in order to fit his reconstruction, which is improper because those dimensions must be proven by evidence

11

aside from the expert's opinion." (Italics added.) We review the trial court's decision to admit Syson's opinion for abuse of discretion. (*People v. Austin* (2013) 219 Cal.App.4th 731, 742 [" 'A claim that expert opinion evidence improperly has been admitted is reviewed on appeal for abuse of discretion. [Citation.]' "].)

Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." This means that " 'the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' " (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1331.) Although "[a]n expert may not base his opinion on conjecture [citation] [the expert] may identify a causative force by a process of eliminating other causes [citation]. [For example, in] arson cases an expert may draw an inference and testify to his opinion that the fire had been ignited by flammable liquid, even though he has found no residue, taste or smell of it. [Citations.] The strength of his assumptions affects the weight rather than the admissibility of his opinion." (*People v. Sundlee* (1977) 70 Cal.App.3d 477, 484-485.)

Here, Syson's opinion that a tire tread separation of sufficient size caused the fuel filler neck to detach and shift out of place was based on inferences supported by the physical evidence and testimony adduced at trial from Plaintiffs' tire and fire experts. In particular, tire expert Troy Cottles testified that he reviewed all of the tires on the vehicle, examined the vehicle, read witness testimony, reviewed testing that had been conducted, and collected evidence from his inspection of the failed tires. Cottles stated that based on the tire's peeled appearance following the fire, the left rear tire suffered a tire tread separation, meaning that the top belt and tread piece separated. He explained that the tire

did not suffer a side wall blow-out because such blow-outs do not result in peeling layers between steel belts, as was present on this tire.

Cottles determined that the tire tread separation preceded the vehicle fire based on the physical appearance of the tire remains. This tire consisted of two belts of wire. Cottles explained that if the fire damaged the tire before separation, he would have expected to find both belts together and there to be a two-belt residue because if fire consumed the tire while it was whole, it would not separate into layers. In contrast, the tire remains at the accident scene consisted of a single belt which had been consumed by fire. Cottles concluded that the separation thus occurred before the fire. Chrysler did not offer conflicting evidence on tire separation.

Plaintiffs' fire expert Michael Schulz testified that he searched for fire patterns, considered witness observations, contemplated fire dynamics, and engaged in a four-step heat inflamed vector analysis to determine the cause of the vehicle fire. Schulz stated that the fire patterns down the driver's side of the vehicle indicated that the fire started in the back of the vehicle and moved across the sliding passenger door toward the driver's door. Because the fire was moving toward the engine compartment, it could not have started there. In addition, there was much less damage to the passenger side (the right side) of the vehicle because the fire did not originate on that side. He explained that the fire occurred "in the area of the left rear wheel well essentially. That's the opening for the filler neck to the gas tank, and it's on [the driver's] side of the vehicle, not the other side." Schulz testified that the burn and fire pattern evidence on the vehicle matched witness testimony regarding the appearance of the fire and Plaintiffs' actions in opening doors and escaping the burning vehicle.

Schulz also stated that physical evidence showed damage to the left tire rim from contact with the ground. He testified that the rim's interaction with the ground would have caused sparking and was a competent source of ignition for the fire. Schulz testified that the fuel source of the fire was the filler neck, based on evidence of the fire's origin, the fuel filler neck's location, the amount of fuel needed to create the fire trail described by eyewitness testimony, and the burnt remnants of the rubber components on the fuel

13

filler neck. Schulz explained that the fuel source had to be liquid gasoline, as it was the only source capable of leaving the fire trail described by witnesses, without any stain on the pavement. In sum, Schulz concluded that the origin of the fire was located at or near the fuel filler neck assembly in the left rear quadrant of the Mares' vehicle, and that liquid gasoline escaped from the fuel system, vaporized, intermixed with ambient air to be within flammable range, and was ignited by friction sparks from the rim or steel treads hitting the pavement.

Syson utilized Cottles' conclusion that there was a tire tread separation, physical evidence, and witness testimony regarding the fire trail as well as Schulz's determination that the fire started in the area of the fuel filler neck to form his opinion that the car fire was started by the tire tread separation causing the fuel filler neck to detach, shift out of place, and leak fuel. Syson testified that the vehicle had a dent in the weld flange (where the inner fender and outer fender wells attach), which lined up with the location of fuel filler neck. Syson stated that the dent was caused by the fuel filler neck after the tread dislodged the filler neck from the gas filler door area. In addition, there was a dent in the fender lip, which matched the diameter of the filler neck; this evidenced that the fuel filler neck had fallen down to the point where it was caught between the tire tread and the wheel lip. The physical evidence indicated that the fuel filler neck was "basically . . . caught and pulled towards the back of the minivan and then, as the tread part got caught behind it, [the fuel filler neck] was pushed outward."

Syson also showed the jury photos of the inner fender well, identified dents in the well that would not normally be there, and stated that the dents show that the fuel filler neck got caught between the inner fender well and the leaf spring (a component of the wheel's suspension system). Syson concluded that as the fuel filler neck came out, the filler neck was impacting and bouncing between the leaf spring and the inner fender well so that the fender liner was moving rearward in the wheel opening. Syson testified that the fuel filler neck caused those dents while the vehicle was still moving because only under such circumstances could this lightweight component have sufficient force to cause the dents.

14

We conclude that Syson's opinion was properly based on the physical evidence. Simply because the tire tread was destroyed in the accident does not mean that Syson could not deduce the causative forces of the vehicle fire. Like in arson cases where an expert may draw an inference and testify to his opinion that the fire had been ignited by flammable liquid, even though the expert found no residue, taste, or smell of it, Syson similarly could deduce here that the tire tread of sufficient size displaced the inner fender liner and the fuel filler neck. Experts Cottles and Schulz respectively determined that there was a tire tread separation prior to the vehicle fire and that the fire originated in the fuel filler neck area after gasoline was ignited by friction sparks. The dented state of the wheel liner and other components as well as the displaced fuel filler neck indicated that the fuel filler neck had been displaced by the tire tread separation and had caused damage to those vehicle components while bouncing around before the vehicle came to a stop. This evidence provided sufficient foundation for Syson's opinion. To the extent that Syson could not provide the exact dimensions of the tread or produce the tread itself simply goes to the weight the jury affords his testimony.

We thus conclude that the court did not abuse its discretion in admitting Syson's expert testimony.

        *b.     Syson's Animation*

Chrysler also argues that the court's admission of Syson's animation was a prejudicial abuse of discretion because (1) Syson's underlying expert opinion that was illustrated by the animation was inadmissible for lack of foundation, and (2) the animation failed to accurately represent Syson's opinion. As explained above, Syson's expert opinion was properly admitted. We therefore do not address Chrysler's first argument regarding foundation any further. As to the second argument, Chrysler attacks the animation on a number of factual grounds, which we address below.

In general, " '[a]nimation is merely used to illustrate an expert's testimony . . . . Animations do not draw conclusions; they attempt to recreate a scene or process, thus they are treated like demonstrative aids. . . .' [Citations.] In other words, a computer animation is demonstrative evidence offered to help a jury understand expert testimony or

15

other substantive evidence . . . ." (*People v. Duenas* (2012) 55 Cal.4th 1, 20 (*Duenas*).) "Trial courts have broad discretion to admit demonstrative evidence . . . to illustrate a witness's testimony." (*People v. Mills* (2010) 48 Cal.4th 158, 207.) "A computer animation is admissible if ' "it is a fair and accurate representation of the evidence to which it relates . . . ." ' " (*Duenas,* at p. 20.)

Here, the animation provided a general demonstration of Syson's opinion. To the extent that Chrysler asserts that aspects of Syson's animation failed to accurately reflect his opinion because specific parts of the vehicle (the fuel filler neck's breakaway housing and the inner liner) were not displayed or inaccurately disappeared during the animation, Syson clarified that these components were still attached in some form to the vehicle, described their position following the tire tread impact, and explained that they were removed from the illustration for the sake of clarity. As to the inner liner, Syson specifically pointed out that it was still displayed in the animation.

Chrysler also asserts that the animation failed to show that the strands from the tire tread grabbed the filler tube, that it inaccurately showed the filler tube moving without any contact from tire tread separation, and that the animation incorrectly showed the left rear wheel spinning as the filler neck fell to street level. Based on our review of the animation, it accurately shows that the tire tread separation interacted with the filler tube as it spun around with the wheel's rotation. For support of its arguments that the tire tread is not accurately represented in the animation, Chrysler cites Syson's answers to questions involving screen captures of the animation. In those screen captures, the tire tread is not interacting with the fuel filler neck because it is in mid-rotation around the wheel. The fuel filler neck nonetheless appeared to have been displaced in the screen captures as a result of the tire tread's impact with the filler neck during the previous wheel rotation. As to the animation's depiction of the wheel spinning while the filler neck dropped, Syson clarified that the filler neck was falling as the wheels were moving, but that the filler neck only completely reached the ground after the wheel came to rest. Thus, to the extent that there was any inaccuracy, Syson clarified how to interpret the

16

animation and such details were inconsequential to the animation's explanation of the causative forces behind the vehicle fire.

Chrysler also opines that "Syson admitted the animation does not reflect the 'real life' effect of compressive forces he believes operated on the fuel system." Chrysler takes Syson's statement out of context in making this argument. In the portion of the transcript cited by Chrysler, Syson clarified that although not depicted, "in real life [the filler neck] would spring up[, and] there would be contact between the filler neck and other parts above." Again, it is unclear, particularly in light of Syson's clarification, how Syson misrepresented his opinion to the jury through this demonstrative aid.

Lastly, Chrysler argues that "[n]one of Syson's tests demonstrated the type of compression on the filler tube connector portrayed in the animation." Notably, Syson stated that his laboratory testing was not intended to recreate the accident, particularly because Syson's laboratory equipment was incapable of accelerating the vehicle to the 72-miles-per-hour speed at which the Mares' vehicle was traveling. The purpose of the testing was to see how or if the various parts of the vehicle would respond to tread separation. Syson stated that the impact forces of the tread on the interior wheel well would have been about double in the real accident of the forces he was able to create in the laboratory test. Thus, the animation was not intended to reflect his laboratory testing, but rather it reflected Syson's expert opinion of what occurred during the accident.

Based on the foregoing, we conclude that the animation provided an accurate overview of Syson's opinion. The court did not abuse its discretion in allowing Plaintiffs to display the animation for the jury.

## 4. The Court Properly Excluded Evidence Regarding the Absence of Other Similar Incidents

Intertwined in its arguments regarding the applicability of the consumer expectation test, Chrysler asserts that the court erred in excluding evidence regarding the absence of other similar incidents. "Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion." (*Pannu, supra,* 191 Cal.App.4th at p. 1317.) "The appropriate test for abuse of discretion

17

is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. [Citations.]" (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) "The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480; Evid. Code, § 354; Code Civ. Proc., § 475.)

Here, the Plaintiffs chose to pursue their design defect claim under a consumer expectation theory. (See *McCabe, supra,* 100 Cal.App.4th at p. 1126 ["A claim of design defect may be proved under the consumer expectation theory (if applicable) or the risk benefit theory. The tests are not mutually exclusive, and a plaintiff may proceed under either or both."].) During an oral motion in limine, Plaintiffs moved to exclude evidence of the absence of other similar incidents, meaning the lack of similar accidents involving this same make and model of vehicle. Chrysler asserted that the lack of other similar incidents "is incredibly probative to the issue that the jury is going to be deciding which is whether or not it fails to meet the expectations for an ordinary consumer."

The court found that testimony regarding the absence of other similar incidents was not relevant to consumer expectations. The court stated that "[a]lthough it was not one of the motions in limine, we did discuss on Thursday the admissibility of the proffered testimony of the defendant concerning the absence of any similar claim. . . . I am inclined to sustain the objection to any testimony concerning the absence of any similar claims. I don't see the relevance of that testimony to the issues in this case. [¶] Negligence is no longer an issue in this case. Just because something did not happen before does not necessarily mean that it cannot happen. . . . So that's just a heads up as to what the court is likely to do in the way of ruling on that evidence."

We conclude that the trial court's exclusion of the absence of other similar incidents was not an abuse of discretion. Pursuant to Evidence Code section 351, "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." Relevant

evidence is "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In addition, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Whether a trial court ought to [admit evidence of the absence of prior similar claims] depends upon the purpose of such evidence and a showing of foundational requirements." (*Benson v. Honda Motor Co.* (1994) 26 Cal.App.4th 1337, 1344.)

We agree that testimony regarding the absence of other similar accidents is irrelevant to a consumer's expectations regarding the product. Consumer expectations are "based on common experience of the product's users," not statistics regarding the absence or abundance of vehicle fires resulting from tire tread separations. (*Soule, supra*, 8 Cal.4th at p. 564.) Not only is the absence of similar incidents irrelevant to the consumer expectation test, but would likely confuse and mislead the jury. As the Supreme Court has stated, "[t]he manufacturer may not defend a claim that a product's design failed to perform as safely as its ordinary consumers would expect by presenting expert evidence of the design's relative risks and benefits." (*Id.* at p. 566.) The Court of Appeal has likewise stated that the consumer expectation test and the risk/benefit test " 'provide alternative means for a plaintiff to prove design defect and do not serve as defenses to one another. A product may be defective under the consumer expectation test even if the benefits of the design outweigh the risks.' " (*Chavez v. Glock, Inc., supra,* 207 Cal.App.4th at p. 1303 quoting *McCabe , supra,* 100 Cal.App.4th at pp. 1120-1121.) Even if this type of car fire caused by a tire separation has never occurred before and thus the benefits of the vehicle's design may outweigh a low risk of harm to the vehicle's occupant, the vehicle can nonetheless fail to meet a consumer's safety expectations. Chrysler's proposed use of the evidence of other similar incidents would have impermissibly used the risk/benefit theory of liability to defend against liability under the consumer expectation test.

19

The Court of Appeal addressed a similar issue in *Morton v. Owens-Corning Fiberglas Corp.* (1995) 33 Cal.App.4th 1529, 1532-1534, where the plaintiffs proved that the defendant's asbestos containing product failed to meet consumer expectations. In that case, the Court of Appeal affirmed the trial court's exclusion of " 'evidence that a particular risk was neither known nor knowable by the application of scientific knowledge available at the time of manufacture and/or distribution.' " (*Id.* at p. 1536.) The court of appeal explained that, "evidence as to what the scientific community knew about the dangers of asbestos and when they knew it is not relevant to show what the ordinary consumer of [the defendant's] product reasonably expected in terms of safety at the time of [the plaintiff's] exposure. It is the knowledge and reasonable expectations of the consumer, not the scientific community, that is relevant under the consumer expectations test. The fact that the scientific community was unaware of the dangers of asbestos, if that is a fact, would not make it any less reasonable for [the plaintiff] or other consumers of [the defendant]'s products to expect that they could work with or near [the defendant's] products without getting cancer." (*Ibid.*)

Likewise here, the absence of similar accidents is not relevant to show what the ordinary consumer of Chrysler's product reasonably expected in terms of safety when operating and riding in the van. The knowledge and reasonable expectations of consumers, not Chrysler's experts, are relevant under the consumer expectation test. We therefore affirm the court's exclusion of Chrysler's evidence regarding the absence of similar incidents.

**5.      There Was No Juror Misconduct at Trial Requiring Reversal**

In its motion for new trial, Chrysler asserted that juror misconduct required reversal of the verdict. Specifically, Chrysler argued that one juror, Mr. Bhambi, improperly presented external evidence to the jury about an airplane fire he witnessed as an engineer in the Indian Air Force, and about a news report regarding a Las Vegas accident where a vehicle burst into flames. Chrysler asserts on appeal that the court erred in denying its motion for new trial and that Bhambi's statements "corrupted the

20

deliberations, prompting at least two jurors to change votes on the special verdict's threshold product defect issue."

"In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation.] First, it must determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.) If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial." (*People v. Dorsey* (1995) 34 Cal.App.4th 694, 703-704.) We independently review whether Chrysler was prejudiced by juror misconduct. (*People v. Ault* (2004) 33 Cal.4th 1250, 1261-1262; *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 158.)

Here, Chrysler presented declarations from three jurors in support of its motion for a new trial. According to the juror declarations, the jury was initially equally divided on the first special verdict question and the jury foreperson informed the court that the jury was unable to reach a verdict. The court then sent the jury back for further deliberations. At that point in time, juror Bhambi told his fellow jurors about a plane fire he witnessed in the Indian army and about a Las Vegas car fire he learned about in the news. Subsequently, Bhambi and three other jurors changed their vote as to the first special verdict form question, which asked: "Did the design of the fuel system on Stephen A. Mares' vehicle fail to perform as safely as an ordinary consumer would have expected at the time of the incident?" The final vote on this question was 10 jurors responding yes, and two responding no.

In the first of three declarations, Juror Baum stated that at the beginning of deliberations he voted in favor of finding no defect in response to question one. He explained that when the court sent the jury back for further deliberations, Bhambi "informed [the jury] about his past experience while he was working as an engineer, in which he described a fire that occurred at the airport where he was working." Baum also stated that Bhambi "discussed an incident that he saw on television that occurred the night before in Las Vegas, which involved a blowout and a wheel liner. He then told us

21

that he believed the wheel liner in this incident interacted with the fuel system to cause the fire." Baum attested that he, Bhambi, and at least one other juror subsequently changed their vote from a finding of "no defect" to a vote in favor of finding a defect on the first special verdict form question.

Juror Ortiz similarly attested in her declaration that she had initially voted in favor of finding no defect in response to question one. She stated that, "[a]fter we returned for further deliberations . . . Bhambi, informed us about his past experience with a plane, while he was working as an engineer, in which there was a fire in the fuel system. He also told us about an incident he saw on television involving a vehicle fire. He then told us he believed the wheel liner in this incident interacted with the fuel system to cause the fire." Ortiz stated: "After discussing his knowledge and prior experience with the other jurors, Mr. Bhambi changed his vote in favor of the plaintiffs. At least one other juror[4] also changed her vote in favor of the plaintiffs, after Mr. Bhambi discussed his prior experience and the wheel liner was taken into consideration. Mr. Bhambi was initially an advocate for a finding of 'no defect' in response to Question No. 1, before he interjected his prior experience involving a plane and the incident he saw on television." Ortiz further stated, "[d]uring deliberations, we were confused about how we were supposed to determine whether there was a design defect in the vehicle, because we were not presented with any evidence related to the design of the fuel system during the trial."

Lastly, juror Bhambi attested that he initially voted in favor of finding "no defect" in response to special verdict form question one. Bhambi stated: "After we returned for further deliberations, I informed the other jurors about my past experience with a plane, while I was working as an engineer for the Indian Air Force, in which a wheel liner caused a fire." He further attested: "I also discussed an incident I saw on television that occurred in Las Vegas on Thursday, February 21, 2013, which involved a vehicle that impacted a taxi and resulted in a fire." Bhambi attached a copy of an article regarding the

---

4       We note that Ortiz did not change her vote on this issue. Ortiz's final vote on the first special verdict form question was no.

Las Vegas incident to his declaration. Bhambi stated that he then asked "the foreperson to send a question to the court to ask whether the wheel liner was part of the design of the fuel system." Bhambi attested that "[a]fter discussing my knowledge and prior experience, as well as the incident I saw on television, I told the other jurors I believed the wheel liner in this incident interacted with the fuel system and caused the fire to occur. Subsequently, I changed my vote in favor of the plaintiffs and a few other jurors also changed their vote from a finding of 'no defect,' to a vote in favor of plaintiffs."

Pursuant to the three-prong test, we address first the admissibility of these declarations and then whether the declarations establish misconduct.

*a. The Supporting Affidavits Were Admissible in Part*

" 'Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.' ([Evid. Code, § 1150, subd. (a)]) It is settled that jurors are competent to prove 'objective facts' under this provision. [Citation.] By contrast, the Legislature has declared evidence of certain other facts to be inadmissible for this purpose: 'No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.' ([Evid. Code, § 1150, subd. (a)]) Thus, jurors may testify to 'overt acts'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror . . . .' [Citation.] [¶] Among the overt acts that are admissible and to which jurors are competent to testify are statements. Section 1150, subdivision (a), expressly allows proof of 'statements made . . . either within or without the jury room . . . .' " (*In re Stankewitz* (1985) 40 Cal.3d 391, 397, italics omitted.)

Here, the juror declarations presented mostly admissible statements. The portions of the declarations regarding the status of the jury's votes before and after Bhambi's

23

statements were admissible as overt acts by the jurors, capable of corroboration. Similarly, the portions of the declarations which describe what Bhambi told his fellow jurors about the two fire incidents and Bhambi's statements to the jury regarding the wheel liner interacting with the fuel system were likewise admissible. These statements were open to the hearing of the jurors and thus subject to corroboration.

Yet, Ortiz's statement about how the jury was confused during deliberations was inadmissible as it concerns the mental processes of the jury, which are not subject to corroboration. The inadmissible portion of Ortiz's declaration specifically states: "During deliberations, we were confused about how we were supposed to determine whether there was a design defect in the vehicle, because we were not presented with any evidence related to the design of the fuel system during the trial." As this statement deals with the subjective reasoning processes of the jurors, it was inadmissible and we do not consider it on appeal.

### b. There Was No Juror Misconduct

"Presentation to or reception by a jury of new evidence from sources outside the trial evidence constitutes misconduct. [Citation.] This includes expert opinions about issues in the case that are not based on the evidence." (*McDonald v. Southern Pacific Transportation Co.* (1999) 71 Cal.App.4th 256, 263.) However, "[a]ll the jurors, including those with relevant personal backgrounds, [are] entitled to consider [the] evidence and express opinions regarding it. '[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.' [Citations.] 'It is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." ' [Citations.] A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors

24

not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations.  'Jurors are not automatons. They are imbued with human frailties as well as virtues.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1266; *In re Malone* (1996) 12 Cal.4th 935, 963.)

Here, the alleged misconduct was that Bhambi told fellow jury members about (1) an experience he had as an engineer in the Indian Air Force in which a wheel liner caused a fire on a plane, (2) a Las Vegas car fire he saw on the television news, and (3) his belief that the wheel liner interacted with the fuel system and caused the fire in the present case.  We conclude that this does not constitute misconduct.

Bhambi did not represent himself as giving expert opinions.  Rather, Bhambi explained his view of the Plaintiffs' evidence to his fellow jury members by relating these two personal experiences regarding fires.  This is not misconduct.  "Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself.  Jurors are expected to be fully functioning human beings, bringing diverse backgrounds and experiences to the matter before them." *(Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 741-742 [finding no misconduct where juror foreperson in case involving liability for plaintiff's physical deformity told jury about her own physical deformity which she had never told anyone about and her own pain and suffering, which no amount of money could compensate].) "A juror does not commit misconduct merely by describing a personal experience in the course of deliberations." (*Iwekaogwu v. City of Los Angeles*, (1999) 75 Cal.App.4th 803, 819 [affirming denial of a new trial where juror in a race discrimination case "gave emotional descriptions of instances of discrimination he had seen as a reserve police officer"].).

Similarly in *English v. Lin* (1994) 26 Cal.App.4th 1358, a personal injury case, the plaintiff's counsel asked the jury to compensate the injured plaintiff for the loss of his dream " 'to play pro ball and then go on to be a commercial artist' " and to award him damages for lost wages. (*Id.* at pp. 1362-1363.)  The jury rendered a verdict in favor of the plaintiff and the defendant moved for a new trial on the ground that a juror had

committed misconduct by stating during deliberations that his brother-in-law was a commercial artist who had started his career making $42,000 but now earned $100,000. (*Id*. at p. 1363.)  In affirming the denial of the motion for new trial, the appellate court noted that, like here, the declaration failed to provide specific information to show that the juror's remarks "were intended by him, or interpreted by other jurors, as additional evidence to consider in this case, as opposed to an explanation as to [the juror's] reasoning processes." (*Id*. at p. 1365.)  As demonstrated in *English*, a juror does not commit misconduct in discussing a personal experience during jury deliberations where the remarks are intended to explain, and are interpreted by the other jurors as explaining, the juror's reasoning process, rather than as additional "evidence," that is, something offered to prove the existence or nonexistence of a fact. (Evid. Code, § 140.)

Likewise here, as in *English*, none of the juror declarations indicated that the statements made by Bhambi were intended by him, or interpreted by other jurors, to be additional evidence or anything beyond an explanation of his reasoning in favor of finding a defect.  There is no evidence that Bhambi held himself out as an expert in accident reconstruction nor is there sufficient evidence that he formed or expressed an expert opinion on whether there was a defect in the fuel system.  (See *People v. Steele, supra,* 27 Cal.4th at pp. 1266-1267 [concluding that jurors did not cross the line into misconduct when they disagreed with the defendant's testimony regarding what he had learned at a particular military school based on the jurors' own experience at the military school, and stating that "it would be an impossibly high standard to permit . . . jurors to express an opinion on . . . evidence without relying on, or mentioning, their personal experience and background."].)  During voir dire, Bhambi disclosed that he was in the Indian Air Force and was a specialist in engine technology.  He stated that he currently works for the post office as an electronic technician, and owns a small coin-operated laundry business.  Nothing in the juror declarations or in the record shows that Bhambi had specialized knowledge regarding accident reconstruction or fuel systems.  Bhambi's single statement that he was once an engineer in the Indian air force and that he had

26

witnessed a plane fire does not establish that he had expertise or specialized knowledge regarding the fuel system or automobile components.

It is unclear what Bhambi meant when he stated that the wheel liner "interacted" with the fuel system and the record does not support a conclusion that this statement is inconsistent the evidence presented at trial. Plaintiffs' evidence clearly implicated the wheel liner in the series of events that caused the fire. Bhambi's vague statement regarding the wheel liner was insufficient to constitute new evidence or an inconsistent expert opinion on the cause of the accident to expand the evidence that the jury was tasked with considering. In sum, integrity of the jury deliberative process remained intact: the evidence fails to indicate that this juror disclosed any material information during deliberations to augment the evidence that was presented at trial. (See *People v. Castro* (1986) 184 Cal.App.3d 849, 857 [reversing because "the very integrity of the jury deliberative process" was jeopardized when a "juror conducted his own experiment at home which inferentially affected his verdict."].)

c.    *Cases Cited by Chrysler Finding Juror Misconduct are Distinguishable*

Chrysler likens Bhambi's statements to the juror misconduct discussed in *Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724 (*Smoketree-Lake*), *Smith v. Covell* (1980) 100 Cal.App.3d 947 (*Smith*), *Clemens v. Regents of University of California* (1970) 8 Cal.App.3d 1 (*Clemens*) , and *McDonald v. Southern Pacific Transportation Co., supra,* 71 Cal.App.4th 256 (*McDonald*). Each case is distinguishable from the present set of facts.

In *Smoketree-Lake*, *supra*, 234 Cal.App.3d at pages 1730-1731, a condominium owners' association sued a developer for damages caused by concrete and grading work within the condominium complex. During jury deliberations, one juror conducted a demonstration of how concrete was poured using kitty litter and crayons, and claimed special knowledge regarding the laying of concrete. (*Id.* at pp. 1745-1746.) The Court of Appeal concluded that the juror's actions constituted misconduct because she represented that she had special knowledge about concrete practices from family members and presented new evidence that could not be challenged by the parties. (*Id*. at p. 1749.)

27

Similarly, in *Smith,* a personal injury case, the court found prejudicial juror misconduct based on a juror's statement. There, a husband and wife sued the driver of an automobile that rear-ended their own. The jury awarded the wife only nominal damages for her injuries, which included low back pain that she did not complain about until six weeks after the collision. (*Smith, supra,* 100 Cal.App.3d at p. 951.) Both before and during deliberations, one of the jurors stated to other jurors that when his back " 'went out' " it did so right away and hurt immediately and that he could still go to work. (*Id*. at p. 952.) The appellate court concluded that these statements constituted impermissible "evidence," (*ibid.*) which the plaintiffs did not have the opportunity to rebut at trial. (*Id*. at p. 954.) Specifically, the juror's statement that his back hurt immediately tended to support the defense doctor's conclusion that the collision did not cause the wife's low back injury because she did not complain about it within 48 to 72 hours, and the juror's statement that he could work also supported the defense counsel's insinuation that the plaintiff's injuries were of psychological origin. (*Ibid.*)

In *Clemens, supra*, 8 Cal.App.3d at pages 18-22, the Court of Appeal remanded for rehearing on the motion for a new trial because the evidence indicated that there may have been juror misconduct. In that medical malpractice case, affidavits from four jurors and an alternate juror reported that one juror stated to the affiants that he intentionally did not volunteer information on voir dire that he was a retired dentist because he believed that had he done so, he would have been challenged; that he had had extensive experience in surgery and knew " 'a lot more about it than you do' "; and that the plaintiff could not convince him that the defendants did not save his life. (*Id*. at pp. 16-17.) In addition, the juror defined medical terms for the other jurors and during deliberation, he refused to discuss the merits of the case but spoke of his own knowledge and experience in medicine as it applied to the facts. (*Id*. at p. 17.) Based on the foregoing, the Court of Appeal remanded for rehearing on these juror misconduct issues. (*Id*. at pp. 18-22.)

Lastly, in *McDonald*, the appellate court found prejudicial juror misconduct based on the statements of one of the jurors during deliberations and reversed. In this personal injury case, the plaintiff, who was injured at a railroad crossing, asserted the theory that

28

he would not have been injured if crossing gates had been present. During deliberations, a juror, who had identified himself in voir dire as a career transportation consultant who had worked with railroads and crossing gates, gave the jury his opinion concerning the placement of crossing gate "sensors," their operation, and the reason why gates could not be installed at the crossing. (*McDonald, supra* 71 Cal.App.4th at pp. 263-264.) The juror illustrated with a diagram where such sensors would be placed, described how yard operations would activate the sensors, and opined that gates would be infeasible because they would continually block the crossing. (*Id.* at p. 264.) There had been no evidence at the trial on the subject of "sensors," and the juror's statement contradicted the testimony of the defendant's trainmaster with respect to the frequency of lowering crossing gates. The juror also offered a rationale for the absence of gates, which the defense's witness had been unable to provide. (*Ibid.*) Because the juror's opinion not only derived from sources outside the evidence but also rebutted a significant element of the plaintiff's proof, which was otherwise undisputed, the appellate court concluded that juror misconduct had occurred. (*Id.* at p. 266.)

All of these cases are inapposite because they involved jurors who introduced facts not in evidence into the jury's deliberations. In contrast, Bhambi's statements to his fellow jurors explained why he found a defect based on two life experiences. There is no indication from any of the juror declarations that he expounded on his statement that the wheel liner interacted with the fuel system, that he explained how wheel liners work or malfunction, that he performed an experiment or demonstration, or that he otherwise introduced outside "facts." During voir dire, Bhambi did not conceal his experience as an engineer in the Indian army, and there is no evidence that that experience made him an expert on the topics before the jury or that he represented himself to be an expert. Moreover, his comment regarding the wheel liner interacting with the fuel system was simply too vague to contradict any evidence presented at trial. We therefore conclude that there was no juror misconduct requiring reversal.

29

## DISPOSITION

The judgment is affirmed.  Plaintiffs and Respondents Stephen A. Mares, Stephen J. Mares, Hethalein Mares, Seth Mares, and Sophia Mares are awarded their costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

I concur:


EDMON, P. J.


ALDRICH, J.